TALLMAN v DEPARTMENT OF NATURAL RESOURCES

Docket No. 71187. Argued May 9, 1984 (Calendar No. 7).—Decided
    December 28, 1984. Released February 11, 1985.

The Director of the Department of Natural Resources ordered the
    commercial fishing licenses of Roger Tallman and Kirk Tall-
    man, Gerald Casey, and Wayne Seaman, suspended for 60 days
    after their refusal to permit conservation officers to inspect
    their fishing vessels, equipment, and catch on the open waters
    of the state without a search warrant. The Delta Circuit Court,
    Clair J. Hoehn, J., affirmed the suspension of the Tallmans'
    license, but reversed the Casey and Seaman suspensions. The
    Court of Appeals, D. F. Walsh, P.J., and Allen, J. (M. F. Cav-
    anagh, J., concurring in the result only), affirmed (Docket No.
    61683). The DNR appeals.

    In an opinion by Chief Justice Williams, joined by Justices
Ryan, Brickley, and Boyle, the Supreme Court *held:*

    The Court adopts the pervasively regulated industry excep-
tion to the requirement that a warrant is required for regula-
tory searches and applies a balancing of interests analysis to
determine that the commercial fishing industry under the
Commercial Fishing Law of 1929 falls within the exception. By
accepting fishing licenses which permit the DNR to inspect
commercial fishing vessels without warrants, commercial fish-
ers have not been required to waive their constitutional free-
dom from unreasonable searches, and therefore there is no
constitutional bar to administrative license suspension under
the Commercial Fishing Law. However, remand is required for
further finding of fact by the Department of Natural Resources
whether inspections "at any time," as authorized in the com-
mercial fishing licenses issued by the department, are necessary
to carry out the purposes of the Commercial Fishing Law.

    1. The United States and Michigan Constitutions protect
against unreasonable searches and seizures. Under the Michi-
gan Constitution, searches without warrants are unreasonable
per se unless they are shown to be within an exception to the

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 68 Am Jur 2d, Searches and Seizures §§ 15, 19.
[3, 4] 70 Am Jur 2d, Shipping §§ 76, 77.

rule. In these cases, the searches were conducted by administrative officers under the authority of the Commercial Fishing Law. Both federal case law and the case law of sister states have held that administrative inspections without warrants of commercial fishing vessels are not unreasonable searches because of the pervasiveness of regulation of the commercial fishing industry. The case law provides guidance and is persuasive authority for adoption of the "pervasively regulated industry" doctrine as the law of Michigan.

2. In applying the "pervasively regulated industry" doctrine, a balance must be struck between the enforcement needs of governmental agencies and the privacy interests of the regulated parties. Conflicts which arise should be resolved by balancing 1) the existence of express statutory authorization of searches and seizures, 2) the importance of the governmental interest, 3) the pervasiveness and longevity of regulation, 4) the inclusion in statutes and regulations of reasonable limitations on searches, 5) the government's need for flexibility in the time, scope, and frequency of inspections to achieve reasonable levels of compliance, 6) the degree of intrusion occasioned by searches, and 7) the degree to which implied consent to such searches is given as a condition of doing business. This balancing of interests is a rational approach because it provides a meaningful distinction between regulatory or administrative searches and those conducted for the purpose of discovering the fruits or instrumentalities of a crime. Regulatory misconduct differs from criminal misconduct, and administrative inspectors must be able to conduct investigations in a manner different from that available to police.

3. When the interests in these cases are balanced, it appears that most of the relevant factors support the DNR's claim that its interest in conducting warrantless searches of commercial fishing vessels without probable cause or exigent circumstances outweighs the fishers' privacy interests. Such searches are statutorily authorized and stem from a governmental interest of paramount importance. Regulation of the commercial fishing industry is longstanding and pervasive. The right to inspect, and the time, place, and frequency of inspections are subject to the limitation that they be necessary to achieving acceptable levels of enforcement. The inspections are limited in scope to a licensee's fishing operations. Thus, the Michigan commercial fishing industry under the Commercial Fishing Law of 1929 falls within the parameters of the pervasively regulated industry exception to the warrant requirement. Because warrantless searches in these circumstances are not unreasonable, fishers

who accept a commercial fishing license are not required to do so on the condition that they waive their constitutional right to be free from unreasonable searches.

4. On the record, the Director of the DNR suspended the licenses of Tallman, Casey, and Seaman without any findings of fact as to the statutory requirement that conditions, terms, and restrictions in the licenses be deemed necessary. As a consequence, a significant statutory requirement was not complied with. To satisfy due process, these cases must, therefore, be remanded to determine whether the condition of the fishers' licenses that inspections may be made at any time is one which is necessary to carry out the provisions of the Commercial Fishing Law. If the DNR could effectively enforce the act and protect the interests sought to be safeguarded by the act without the requirement as a condition of the license, then the statute requires a less intrusive course to be taken. The requirement in that instance would not be necessary to effective enforcement of the act. There remains the possibility that there may be some time at which inspections are necessary. Thus, if the requirement is not necessary, the DNR should also determine whether the suspensions of the licenses in these cases were legally valid as during a time in which inspections were necessary.

Reversed and remanded.

Justice Levin, joined by Justice Kavanagh, wrote separately that the attempted inspection of commercial fishing vessels in open waters by the Department of Natural Resources may not be justified on the basis of language in the commercial fishing license purporting to authorize the inspection of vessels because the scope of the inspection facially permitted by the license (i) exceeds statutory authorization and (ii) violates the constitutional prohibition of unreasonable searches and seizures.

1. The nature of the commercial fishing industry justifies regulation and official inspections for the protection of the public. The Commercial Fishing Law permits inspection of premises and property that comprise the fishing operations of a licensee, presumably those areas of a vessel where fish are caught and stored. By confining inspections to such areas of commercial vessels, the privacy of vessel owners and their employees may be protected without sacrificing the legitimate need to regulate the commercial fishing industry. The commercial fishing licenses issued to the plaintiffs, however, provide that officials of the DNR may at any time inspect the vessels, vehicles, books, records, documents, or other property used in carrying on the licensee's fishing operations and business, thus

exceeding the authorization of the statute. Because the license on its face authorizes inspections of private, non-business operations and areas of the vessel, it exceeds the statutory authorization. An attempted inspection under the purported grant of authority to inspect fishing vessels set forth in the license exceeds the authorization of the statute.

2. Commercial fishing licensees have a constitutional right to be free from unreasonable searches and seizures. A warrantless search conducted without probable cause to believe that a violation of law has occurred may not intrude into those areas of a vessel that cannot properly be deemed part of fishing operations without probable cause to believe that a violation of law has occurred and exigent circumstances justifying the failure to obtain a warrant. That evidence of illegal activity might be found in such private areas does not justify a warrantless search any more than the possibility that illegal contraband might be found in a private residence would justify a warrantless intrusion into the residence.

3. The issuance or retention of a license may not be conditioned on the surrender of a fundamental constitutional right. The inspection provision set forth in the commercial fishing license facially permits warrantless searches that exceed constitutional limitation as well as the authority conferred by the statute. A property owner's refusal to permit a warrantless search when there is no probable cause to believe that a violation has occurred continues the exercise of a fundamental right. Such action may not be penalized by the state through the suspension of a license issued by the state.

4. The fact that an industry is, or has been, pervasively regulated does not justify governmental intrusion into the affairs of those subject to the regulation. It is, rather, the nature of a particular activity or industry that justifies governmental regulation for the protection of the public and may justify limited warrantless intrusion for the purpose of regulatory enforcement.

123 Mich App 132; 333 NW2d 193 (1983) reversed.

OPINION OF THE COURT

1. FISH AND FISHERIES — ADMINISTRATIVE LAW — SEARCHES AND
   SEIZURES — COMMERCIAL FISHERS.

Regulatory and administrative searches of commercial fishing vessels without warrants under the authority of the Commercial Fishing Law are not unreasonable because of the pervasiveness of the regulation of the commercial fishing industry; on balance, the interest of the government in regulating the

commercial fishing industry outweighs a licensed fisher's privacy interest in fishing operations (MCL 308.1b[2][e]; MSA 13.1491[2][2][e]).

2. ADMINISTRATIVE LAW — SEARCHES AND SEIZURES — PERVASIVELY REGULATED INDUSTRIES.

In determining whether a search and seizure without a warrant falls within the pervasively regulated industry exception to the requirement that a warrant is required for regulatory and administrative searches, a court should balance 1) the existence of express statutory authorization of such searches and seizures, 2) the importance of the governmental interest, 3) the pervasiveness and longevity of regulation, 4) the inclusion in statutes and regulations of reasonable limitations on searches, 5) the government's need for flexibility in the time, scope, and frequency of inspections to achieve reasonable levels of compliance, 6) the degree of intrusion occasioned by the search, and 7) the degree to which implied consent to such searches is given as a condition of doing business.

3. FISH AND FISHERIES — ADMINISTRATIVE LAW — SEARCHES AND SEIZURES — LICENSES.

Commercial fishers, by accepting commercial fishing licenses that permit the Department of Natural Resources to inspect commercial fishing vessels without warrants, do not waive their constitutional right to be free from unreasonable searches because such searches are not unreasonable; thus, there is no constitutional bar to administrative license suspension under the Commercial Fishing Law (US Const, Am IV; Const 1963, art 1, § 11; MCL 308.1b[2][e]; MSA 13.1491[2][2][e]).

SEPARATE OPINION BY LEVIN, J.

4. FISH AND FISHERIES — ADMINISTRATIVE LAW — SEARCHES AND SEIZURES — LICENSES.

*Inspection by the Department of Natural Resources of a commercial fishing vessel in open waters of the state without a warrant may not be justified on the basis of language in the commercial fishing license purporting to authorize such inspections because the scope of the inspection facially permitted by the license exceeds statutory authorization and violates the constitutional prohibition against unreasonable searches and seizures (US Const, Am IV; Const 1963, art 1, § 11; MCL 380.1b[2][e]; MSA 13.1491[2][2][e]).*

*Green, Renner, Weisse, Rettig, Rademacher & Clark, P.C.* (by *Nino E. Green*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Stewart H. Freeman* and *Elizabeth L. Valentine,* Assistant Attorneys General, for the defendant.

WILLIAMS, C.J. This case concerns a Department of Natural Resources suspension of plaintiffs' commercial fishing licenses for refusal to permit department officers to board and inspect fishing vessels, equipment, and catch on the open waters of this state without a search warrant. The DNR relied on the Commercial Fishing Law of 1929, as amended, MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e) and the provisions of the licenses issued under that law as authority for their attempted search and license suspension.

MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e) provides that the DNR may issue commercial fishing licenses, which may contain provisions such as:

"Specifying other conditions, terms, and restrictions which are *deemed to be necessary* in carrying out the provisions of this act, including but not limited to the right to inspect the licensee's fishing operations in the waters, on board or ashore." (Emphasis added.)

The licenses issued contained the following provision:

"The director of the Department of Natural Resources or his representative *may at any time inspect* the vessels, vehicles, books, records, documents or other property used in carrying on the licensee's fishing operations and business. . . . " (Emphasis in Summons and Petition for Review.)

The ultimate issues consequently become:

(1) Whether suspensions of the licenses based upon the above legislative and license provisions are

invalid because this may, in the words of the circuit judge, "require the waiver of constitutional rights as the condition to the issuance of a license," *People ex rel Attorney General v Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120 (1950), and

(2) Whether the DNR, on the basis of MCL 308.1b(4); MSA 13.1491(2)(4), permitting suspension of licenses "where the licensee fails to fulfill or violates any of the conditions, terms or restrictions of the license," properly suspended licenses providing "[t]he director . . . *may at any time inspect* the vessels," etc., where the legislation authorizing the license permitted "[s]pecifying other conditions, terms, and restrictions which are *deemed to be necessary* in carrying out the provisions of this act. . . ."

We hold that the DNR could validly seek to suspend the licenses because the legislation and license do not require the waiver of the constitutional right against unreasonable search as a condition to the issuance of a license. A search without a warrant in the commercial fishing industry under the instant legislation and license is not unreasonable for three reasons. First, the fishing industry has historically been pervasively regulated and falls within the *Colonnade-Biswell* doctrine permitting inspection without a search warrant. Second, the fishing industry is a peculiar industry dealing with food which is the general property of the people of Michigan and hence requires operations open to public scrutiny to search without warrant. Third, the inspections under the *Colonnade-Biswell* doctrine are limited to business operations and exclude private and non-business operations and areas.

Also, without further factfinding, we are unable

to determine whether the inspections attempted here were "necessary" to carrying out the provisions of the Commercial Fishing Law. Even though the license permits inspection "at any time," we do not hold that failure to consent to such search is justification per se for license revocation. License revocation requires an independent showing of violation of any condition, term, or restriction which shall be deemed necessary in carrying out the provisions of the Commercial Fishing Law. We remand these cases to the Director of the Department of Natural Resources to create this factual record.

## I. FACTS

Plaintiffs Roger and Kirk Tallman, Gerald Casey, and Wayne Seaman harvest whitefish and other varieties of fish from the waters of northern Lake Michigan for sale in commercial markets. Each day they leave port on the Garden Peninsula, travel to trap-nets strategically placed in the open waters, empty the nets of their natural bounty, and return to port with their catch. Fish brought on board are sorted, iced, and stored in large boxes below deck.

The Michigan Department of Natural Resources issued licenses to Roger and Kirk Tallman, jointly, and to Gerald Casey and Wayne Seaman, individually, to engage in commercial fishing. The plaintiffs each were approached in the open waters of Lake Michigan by DNR officers, and each refused the officers' requests to allow inspection of their vessels and their catch. At no time did the DNR officers apply for or obtain a warrant to search these vessels. The individual circumstances of each request and refusal appear below.

A. *Roger and Kirk Tallman,*
   *Commercial Fishing License No. 315*

On November 5, 1979, a DNR officer received information that a DNR patrol boat had discovered two trap-nets on the east side of the Garden Peninsula. The season for fishing with such nets was closed. Later that same day, the officer learned that the previously observed trap-nets had been taken out of the water. The trap-net boat *Viking,* belonging to plaintiffs Roger and Kirk Tallman, had been seen in the area and was reportedly returning toward Fairport. DNR officers on patrol received instructions to check the *Viking* for fish on board if they observed it. When the officers came alongside the *Viking,* they observed a trap-net on the deck. Their request for permission to board was refused. However, one of the Tallmans offered to allow the officers an opportunity to inspect his vessel back at Fairport, which the officers accepted. It took nearly an hour to follow the *Viking* into port, but the officers were willing to inspect at port because other DNR and state police officers were there awaiting their arrival. The inspection disclosed no fish on board. The Tallmans stated as their reason for refusing to allow the inspection on the water their fear that a small boat they were towing would bump into and harm their trap-net boat if they were forced to come to a stop. However, a DNR officer testified before the DNR hearing examiner that stopping the boat posed no danger of injury.

B. *Gerald Casey,*
   *Commercial Fishing License No. 458*

On September 25, 1979, a DNR officer and an accompanying marine officer and biologist were

patrolling the area of Round Island and Chippewa
Point when they observed from a distance of 20-30
feet what they believed to be an undersized white-
fish on board Casey's vessel. The officers re-
quested permission to board the vessel in order to
inspect the catch. Casey refused permission, but
offered to allow inspection at Fairport. The DNR
officers declined this invitation. They were approx-
imately 8-10 miles from Fairport, and because of
what they described as a "rather hostile environ-
ment in Fairport," they felt there was some danger
in going there to inspect. The DNR fisheries biologist
testified before the DNR hearing examiner that
even if they had followed the Casey vessel to port,
Casey could have thrown any illegal fish overboard
without their observing it.

C. *Wayne Seaman,*
   *Commercial Fishing License No. 318*

On July 3, 1979, a DNR officer, fish biologist,
and marine safety officer were on routine patrol
between Summer and Poverty Islands, working
their way down the shoreline checking commercial
fishing buoys. When they observed Seaman's ves-
sel, the *Finn,* they requested permission to board
to inspect his catch. Although Seaman offered to
allow inspection back at Fairport, 8-9 miles away,
the DNR officers declined.

More than one month later, on August 26, 1979,
conservation officers again requested permission to
inspect the *Finn* in an area northwest of St. Mar-
tin's Island on Big Bay de Noc. The officers had

general information that illegal commercial traffic in undersized whitefish and lake trout was coming from the Garden Peninsula area, but had no information regarding any particular involvement by Seaman.

Seaman again refused to allow the DNR officers to inspect his catch or the mesh size of his nets. When one officer boarded the *Finn* and announced his intent to inspect the catch, Seaman and his crew members attempted to push the officer off the boat. At no time did the officer attempt or threaten to use force to make his inspection.

D. *Administrative and Lower Court Action*

On May 23, 1980, the Director of the DNR issued administrative complaints against the Tallmans, Casey, and Seaman requesting the suspension of the plaintiffs' commercial fishing licenses for a period of sixty days. A hearing examiner issued a proposed decision that the complaints against Seaman and Casey be dismissed and that the Tallmans' license be suspended for the requested period. The hearing examiner found that the DNR had probable cause to believe that the Tallmans were using illegal trap-nets and that exigent circumstances existed for the warrantless search. He also found that neither probable cause nor exigent circumstances justified the attempted searches of the Seaman and Casey vessels.

In addition, he concluded that the pervasively regulated industry exception to the warrant requirements was inapplicable because warrantless inspections were not a crucial part of the DNR's regulatory scheme, and because the DNR's enforcement needs could be satisfied by means of ex

parte warrants authorizing inspections of fishers in particular areas, without making any findings of fact on this subject. The Director of the DNR, however, rejected the hearing examiner's conclusions and ordered that all three licenses be suspended, also without any further findings of fact. The Delta Circuit Court stayed the enforcement of the director's order, and ultimately reversed as to Seaman and Casey, adopting the facts set forth in the hearing examiner's report. The Court of Appeals affirmed the circuit court's ruling but invited this Court to reexamine our decision in *DNR v Seaman*, 396 Mich 299; 240 NW2d 206 (1976), on which it and the circuit court had relied. *Tallman v DNR*, 123 Mich App 132; 333 NW2d 193 (1983). The Court of Appeals stated:

"That Michigan's commercial fishing industry is pervasively regulated cannot be gainsaid. MCL 308.1 *et seq.*; MSA 13.1491 *et seq.* The Legislature has declared that all fish in Michigan waters of the Great Lakes are property of the state and that the taking thereof is a privilege. MCL 308.1; MSA 13.1491. In our judgment, there is not necessarily any constitutional infirmity in inspections without warrants, without probable cause and exigent circumstances, of the vessels of individuals who, pursuant to Michigan's comprehensive regulatory scheme, are granted licenses to take for their own profit an important, protected natural resource of the state." *Id.,* p 139.

We granted the DNR's application for leave to appeal on December 6, 1983. 418 Mich 879 (1983).

## II. RIGHT OF THE DNR TO SUSPEND LICENSES

The DNR contends that it can suspend the instant licenses because of its powers under the Commercial Fishing Law of 1929 and the license issued thereunder. However, *People v Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120

(1950), teaches that the DNR cannot penalize[1] a licensee for refusal to submit to an inspection if the penalty is based on the requirement that a licensee waive the constitutional right to be free from an unreasonable search. *Id.,* pp 425-426, 431-432. In *Lansing Municipal Judge,* the DNR was not permitted to inspect the personal effects of a private citizen licensed by the DNR to hunt, fish, or trap for recreational purposes under 1948 (1st Ex Sess) PA 43, MCL 300.23; MSA 13.1231(3) (repealed by 1964 PA 256). The majority found that these portions of the conservation law permitted an unreasonable search, and thus ran afoul of the constitutional proscription against such unreasonable search. The minority, agreeing with the majority that a penalty could not be based upon a waiver of the right against unreasonable search, disagreed with the majority's finding that the portions of the conservation law required such a waiver. *Id.,* p 423.

The issue before this Court thus is whether the basis on which the DNR seeks to suspend the instant licenses does or does not depend upon such a waiver of the constitutional right against unreasonable search. We find that the provisions of the Commercial Fishing Law of 1929 at issue here do not permit an unreasonable search. We base our finding of "reasonableness" on the doctrine of

---

[1] In *People v Lansing Municipal Judge,* there was an attempted prosecution for the failure to submit to an unreasonable search. In that case, the issue was whether the hunter could be prosecuted for failure to submit to an unreasonable search. Because we find that a warrantless search is permissible in this pervasively regulated industry under the balancing test herein promulgated, we refrain from deciding whether the suspension of a license, rather than the forcing of a search, or the prosecution for refusing to consent to a search, invokes the same interests as a search. It is, therefore, also unnecessary to decide whether a license revocation is deserving of less constitutional protection than a search where it occurs in a non-pervasively regulated industry, but where the expectation of privacy is similarly low.

pervasively regulated industries as applied to Michigan's commercial fishing industry under the Commercial Fishing Law of 1929.

### III. THE PERVASIVELY REGULATED INDUSTRY DOCTRINE

The DNR contends that its licensing and inspection scheme withstands scrutiny under both the Michigan and United States Constitutions. Because different standards have sometimes evolved under each Constitution, we shall address state and federal doctrine separately. At the outset, however, we note our responsibility to construe the statute to give it validity and a reasonable operation, if possible. *Argo Oil Corp v Atwood,* 274 Mich 47, 53; 264 NW 285 (1935).

A. *Present Interpretation of the Michigan Constitution*
Our state constitution provides that

"[t]he person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state." Const 1963, art 1, § 11.

A warrantless search is unreasonable per se and violates the Michigan Constitution unless shown to be within an exception to this rule. *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975). This Court has sanctioned warrantless searches by law enforcement officers who have probable cause to

believe that a violation of the law has occurred, when exigent circumstances make obtaining a warrant unfeasible. *DNR v Seaman, supra.*

At first blush, *Seaman* would seem to control the case before us. There the defendants, commercial fishing licensees, were restricted under DNR regulations to using gill nets of a certain mesh size. On three separate occasions, DNR officials observed the defendants conducting illegal fishing activities and seized fish or fishing equipment in their possession. The third seizure, the only one challenged as unlawful, marked the culmination of a day and a half of surveillance of the defendants' activities by the DNR. After establishing the presence of illegal gill nets on the defendants' boat, the officers lay in wait until the boat was moored. At 8:45 p.m., the officers sought and were refused permission to search the vessel; subsequently they broke into the vessel with an axe and seized both the vessel and its cargo of fish and nets. *Id.,* pp 306-307. We held that this search and seizure violated the Michigan and United States Constitutions because no "exigent circumstances" justified the failure of the DNR to obtain a warrant for their search. Because the vessel was moored for the evening, it seemed unlikely that defendants could escape and dispose of the incriminating evidence. "The facts suggest that the DNR officials had ample time to obtain a valid search warrant." *Id.,* p 316.

Several factors distinguish *Seaman* from the cases presently before this Court. Here the DNR seeks ratification of searches attempted on the open water during the course of plaintiffs' fishing operations. Unlike the commercial fishers in *Seaman,* the plaintiffs here could readily escape the scrutiny of DNR inspectors because of the mobility of their vessels and the easy disposability of illegal

fish and equipment into the depths of Lake Michigan. Thus, these cases present facts under which the "exigent circumstances" traditionally required to justify a warrantless search are more likely to be present.

More importantly, the DNR has raised a legal question not considered in or disposed of by *Seaman.* In that case, the Court construed MCL 300.12; MSA 13.1222, which explicitly authorizes warrantless searches based on probable cause to believe that a violation of the state's fish and game laws has occurred. That statute appears as part of Chapter 300 of the Michigan Compiled Laws, entitled "Fish and Game." The same chapter places upon a commission of conservation the responsibility for regulating the taking and killing of "all fish, game and fur-bearing animals and game birds protected by the laws of this state. . . ." MCL 300.1; MSA 13.1211. Thus, the statute reviewed in *Seaman* authorized searches for the purpose of enforcing regulations regarding wild animals, wild birds, and fish against commercial and recreational violators alike.

The statute at issue in the cases presently before the Court is MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e), which authorizes state conservation officers to inspect a commercial "licensee's fishing operations in the waters, on board or ashore." This statute appears within Chapter 308 of the Michigan Compiled Laws, entitled "Commercial Fishing," and hence applies *only* to those licensed by the state to harvest the state's fishery resources for personal profit. The fact that the statute at issue here is exclusively applicable to commercial fishers is especially relevant, because the DNR has raised a question of first impression not touched upon in *Seaman* or in any other decision of this Court: the

legality of a warrantless search of commercial premises for the purpose of enforcing a pervasive regulatory scheme. For these reasons, *Seaman* does not control the disposition of this case.

## B. *The United States Constitution*

The Fourth Amendment to the United States Constitution states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but on probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV.

This amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). Traditional Fourth Amendment doctrine teaches that warrantless searches are illegal absent a finding of probable cause to believe that a violation of the law has occurred, and absent the presence of exigent circumstances which make obtaining a warrant unfeasible. However, the Supreme Court has fashioned different standards in the area of administrative searches in order to accommodate both the government's interest in maintaining an acceptable level of compliance with administrative regulations and the private business person's interest in remaining free from arbitrary governmental intrusions.

Before the United States Supreme Court arrived at the "pervasively regulated industry" doctrine, it defined a standard of probable cause generally applicable in cases of administrative searches. This intermediate standard has not been passed on by

this Court, nor is it at issue in this case.[2] However, because of its relevance to the development of the pervasively regulated industry doctrine, we review it to better understand the pervasively regulated industry doctrine.

Most administrative searches must be accompanied by a warrant issued by a magistrate who has found that probable cause exists for its issuance. However, the probable cause requirement is met where the government shows that reasonable administrative or legislative standards for conducting the inspection have been satisfied. *Camara v Municipal Court of San Francisco*, 387 US 523; 87 S Ct 1727; 18 L Ed 2d 930 (1967); *See v Seattle*, 387 US 541; 87 S Ct 1737; 18 L Ed 2d 943 (1967). *Camara* involved a citizen's challenge to his prosecution for refusal to allow city officials to inspect his leased premises as part of a routine annual inspection for violation of the city's housing code. Similarly, the plaintiff in *See* challenged his prosecution for refusal to permit city fire department officials to inspect his commercial warehouse as part of a city-wide canvass for fire and safety code violations. The Court engaged in a "balancing of interests" analysis before holding that an administrative search warrant should be available upon a showing of probable cause less stringent than that required for obtaining a criminal search warrant:

"Unfortunately, there can be no ready test for determining reasonableness other than balancing the need to

---

[2] In *People v Tyler*, 399 Mich 564, 571-577; 250 NW2d 467 (1977), *aff'd in part and rev'd in part sub nom Michigan v Tyler*, 436 US 499; 98 S Ct 1942; 56 L Ed 2d 486 (1977), we recognized that the United States Supreme Court had drawn distinctions between "regulatory," "administrative," and "criminal" searches and had fashioned different standards of "reasonableness" for each. Because we found that the executive official in *Tyler*, a fire chief, had probable cause for issuance of a *criminal* investigative search warrant, we were not required to discuss standards applicable in this state for regulatory or administrative searches.

search against the invasion which the search entails."
*Camara,* pp 536-537.

These cases are instructive for two reasons.
First, *Camara* recognized the reasonableness of the
"area inspection." In neither that case nor in *See*
did the city officials have a reason to believe that
code violations would be discovered in the particu-
lar building occupied by the plaintiff. Rather, the
agency's decision to inspect was based on its ap-
praisal of conditions in the area as a whole. *Cam-
ara,* pp 536, 538. While the Supreme Court struck
down Camara's prosecution because city officials
had attempted a warrantless inspection, it ap-
proved as "reasonable" the practice of implement-
ing an inspection program on the basis of such
factors as the passage of time since the last inspec-
tion, the nature of the premises to be inspected,
and the condition of the entire area to be in-
spected. *Camara,* p 538.[3] Second, the Court left
itself free to explore at a later date the potential
distinction between searches of private and com-
mercial premises. Although the business person is
protected by the Fourth Amendment against un-
reasonable official entries on commercial property,
the Court explained:

"We do not in any way imply that business premises
may not reasonably be inspected in many more situa-
tions than private homes, nor do we question such
accepted regulatory techniques as licensing programs

[3] A magistrate faced with deciding whether an administrative
search warrant should issue would not be free to assess the agency's
decision to canvass an area, but could only consider whether the
inspection for which a warrant is sought is consistent with an
established inspection policy. LaFave, *Administrative searches and
the Fourth Amendment: The* Camara *and* See *cases,* 1967 S Ct R 1,
25. See also Note, *Administrative search warrants,* 58 Minn L R 607,
645 (1974). Professor LaFave observed that the Supreme Court's
ruling raises a real risk that the warrant procedure will become a
"rubber-stamp process." LaFave, *supra,* p 27.

which require inspections prior to operating a business or marketing a product. Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness." *See,* pp 545-546.

Since it made this statement, the United States Supreme Court has had an opportunity to examine the reasonableness of a warrantless search incident to a pervasive scheme of commercial regulation on four occasions. The "pervasively regulated industry" exception was first identified in *Colonnade Catering Corp v United States,* 397 US 72; 90 S Ct 774; 25 L Ed 2d 60 (1970). Federal agents of the Internal Revenue Service forcibly entered and made a warrantless search of the plaintiff's business premises. The plaintiff held a state license to serve alcoholic beverages and a federal retail liquor dealer's occupational tax stamp. Congress had given the Secretary of the Treasury broad authority to enter and inspect the premises of retail liquor dealers and to impose fines for their refusal to allow such inspections. 26 USC 5146, 7342, 7606. The Court ultimately held that the liquor seized in the dealer's establishment must be returned and suppressed as evidence, because the government agents had used unauthorized force to accomplish their search. However, the Court upheld the government's right to conduct the warrantless search, relying on the explicit Congressional authorization and the long subjection of the liquor industry to close governmental supervision.

The firearms industry received similar treatment in *United States v Biswell,* 406 US 311; 92 S Ct 1593; 32 L Ed 2d 87 (1972). The 1968 Gun Control Act specifically authorized inspections of the commercial premises of those licensed to deal in sporting weapons during business hours and for

the limited purpose of examining the dealer's records and firearms. 18 USC 923(g). A federal treasury agent visited a pawn shop which held such a license; although the agent did not have a search warrant, he was allowed to inspect a locked storeroom after showing the owner a copy of the statute which authorized his entry. The agent discovered two sawed-off shotguns that the owner was not licensed to possess.

The Tenth Circuit Court of Appeals held that the statute was an unconstitutional authorization of warrantless searches and that the owner's ostensible consent to the search was involuntary because the search was not conducted pursuant to lawful authority. *United States v Biswell,* 442 F2d 1189 (CA 10, 1971), relying on *Bumper v North Carolina,* 391 US 543; 88 S Ct 1788; 20 L Ed 2d 797 (1968). The United States Supreme Court reversed, however, holding that the statute which authorized the search was constitutionally sound. The Court stated, "In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." *United States v Biswell,* 406 US 311, 315; 92 S Ct 1593; 32 L Ed 2d 87 (1972). The Court looked to the deeply rooted history of governmental control of the firearms industry and the crucial role played by random inspections in the regulatory scheme: "Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential." *Id.,* p 316. In addition, the Court noted that the dealer accepted a federal license with the knowledge that his records and firearms would be subject to effective inspection.

The Court reached a contrary result where the congressionally authorized search was not limited

to a single industry, but extended to all businesses engaged in interstate commerce. *Marshall v Barlow's, Inc,* 436 US 307; 98 S Ct 1816; 56 L Ed 2d 305 (1978). Occupational, Safety and Health Administration officials had attempted a warrantless inspection of the nonpublic area of an electrical and plumbing installation business. The agents had no probable cause to believe the particular business was violating OSHA regulations; it had been selected for inspection on the basis of the industry's accident record and the number of its employees exposed to health and safety risks. *Id.,* p 321, fn 17. Like the statutes in *Colonnade* and *Biswell,* the authorizing legislation specifically allowed a search of the work area of any facility within the act's jurisdiction during reasonable times and within reasonable limits. 29 USC 657(a). However, the Court distinguished those cases on the grounds that

"businessmen engaged in such federally licensed and regulated enterprises [as liquor and firearms] accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Id.,* p 313 citing, *Almeida-Sanchez v United States,* 413 US 266, 271; 93 S Ct 2535; 37 L Ed 2d 596 (1973).

The Court concluded that OSHA's enforcement activities would not be endangered by requiring OSHA to obtain a search warrant under the diluted "probable cause" standard established in *Camara.*

Finally, the Court recently upheld the warrantless search of a stone quarry conducted under authority of the 1977 Federal Mine Safety & Health Act, 30 USC 813(a). *Donovan v Dewey,* 452

US 594; 101 S Ct 2534; 69 L Ed 2d 594 (1981). That act established a "predictable and guided federal regulatory presence" in the mines. *Id.,* p 604. In addition, the industry had a notorious history of serious accidents, making governmental enforcement of safety standards especially imperative. The Court pointed out that the pervasiveness and regularity of an enforcement scheme, and not its longevity, were particularly relevant considerations:

"Of course, the duration of a particular regulatory scheme will often be an important factor in determining whether it is sufficiently pervasive to make the imposition of a warrant requirement unnecessary. But if the length of regulation were the only criterion, absurd results would occur. . . . [N]ew or emerging industries, including ones such as the nuclear power industry that pose enormous potential safety and health problems, could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation." *Id.,* p 606.

See also *United States v Kaiyo Maru,* 503 F Supp 1075, 1085 (D Alas, 1980), *aff'd* 699 F2d 989 (CA 9, 1983).

These four cases, and their progeny in the lower courts,[4] establish a new exception to the warrant

[4] The *Colonnade-Biswell* exception has been relied upon by lower federal courts to justify warrantless searches by officers of the Food & Drug Administration incident to the licensing of bakeries, *United States v Del Campo Baking Mfg Co,* 345 F Supp 1371 (D Del, 1972), and incident to inspection of warehouses containing federally regulated food products, *United States v Business Builders, Inc,* 354 F Supp 141 (ND Okla, 1973). Also upheld were warrantless searches by officers of the Secretary of the Interior of heavily regulated coal mines, notwithstanding the absence of any federally licensed activity, *Youghiogheny & Ohio Coal Co v Morton,* 364 F Supp 45 (SD Ohio, 1973), and warrantless searches by state narcotics officers of a pharmacist's records pertaining to narcotics, *United States ex rel Terraciano v Montanye,* 493 F2d 682 (CA 2, 1974).

requirement where several conditions are met: 1) Congress has explicitly authorized the search and seizure,[5] 2) the industry has a long history of regulation, or is pervasively regulated,[6] 3) reasonable legislative or administrative standards for conducting an inspection exist,[7] 4) random, frequent, and unannounced inspections are necessary to deter illegal conduct,[8] and 5) a business person may be said to have implicitly consented to the search.[9]

The lower federal courts have applied the *Colonnade-Biswell* "pervasively regulated industry" exception to uphold warrantless searches of commercial fishing vessels by federal officers enforcing federal statutes having as their goal the preservation and management of marine life in United States coastal waters. The Fishery Conservation and Management Act of 1976 authorizes Coast

One commentator has noted that the *Camara-See* diluted test for "probable cause" for issuing a warrant is very similar to the test used in *Del Campo* and *Youghiogheny* to determine whether a warrantless administrative inspection is constitutionally "reasonable." McManis & McManis, *Structuring administrative inspections: Is there any warrant for a search warrant?*, 26 Am U L R 942, 960-961 (1977). This may indicate that courts undertake a balancing analysis in their determination of whether "reasonable administrative or legislative standards for conducting an area inspection are satisfied," *Camara,* p 538, similar to that engaged in under the *Colonnade-Biswell* line of cases.

[5] *Colonnade, supra,* pp 73-74, 76-77; *Biswell, supra,* pp 311, 317; *Donovan, supra,* pp 596-597, 604.

[6] *Colonnade, supra,* pp 75, 77; *Biswell, supra,* pp 315-316; *Donovan, supra,* pp 599, 606.

[7] *Colonnade, supra,* p 77; *Biswell, supra,* p 315; *Barlow's, supra,* p 323; *Donovan, supra,* pp 599, 601, 604. See also *Dunlop v Hertzler Enterprises, Inc,* 418 F Supp 627, 632 (D NM, 1976) (requiring OSHA to obtain an administrative search warrant before performing regulatory inspections).

[8] *Biswell, supra,* p 316; *Donovan, supra,* pp 602-603.

[9] *Biswell, supra,* p 316; *Barlow's, supra,* p 313; *Donovan, supra,* pp 590-600, 603-604; *Cf. Almeida-Sanchez v United States, supra* (private individual not engaged in a pervasively regulated or licensed business did not implicitly consent to search by the United States Border Patrol).

Guard officers to board, search, or inspect a fishing vessel subject to the act at any time with or without a warrant. 16 USC 1821(c)(2)(A), 1861(b). The regulations promulgated under the act make it unlawful for anyone to refuse to allow an authorized officer to board a vessel for the purpose of conducting a search in connection with enforcing the act. 50 CFR 611.7(a)(4).

These provisions were upheld against a challenge that they violated the Fourth Amendment rights of a commercial fisher who held a permit under the act. *United States v Tsuda Maru,* 470 F Supp 1223 (D Alas, 1979). The Coast Guard sought to conduct a routine inspection of the vessel, and conceded for purposes of the constitutional challenge that there was "no articulable suspicion or probable cause to believe a violation of law had taken place at the time the initial boarding and routine inspection took place." *Id.,* p 1227. The court relied on the important federal interests at stake in the enforcement of the fisheries management program, the fact that the scope of the search was implicitly restricted to those areas of the ship which must be inspected to enforce the fishing regulations, and the fact that "[t]he detailed regulation of fishing has become over the years so commonplace that persons engaged in that business could not entertain a justifiable expectation of being immune from reasonable inspection." *Id.,* p 1229.

The same provision of the Fishery Conservation and Management Act was again upheld against a Fourth Amendment challenge in *United States v Kaiyo Maru, supra.* There the Coast Guard boarded and detained a Japanese trawler which held a fishing permit under the act in order to examine its records and inspect its catch. The search revealed substantial overlogging and mis-

logging of the catch and illegal possession of halibut. The Coast Guard had neither probable cause to believe a violation had occurred nor were exigent circumstances apparent prior to boarding. In its application of the *Colonnade-Biswell* exception to the facts, the court stressed the comprehensive system of federal control established by the act, and the crucial role played by the self-reporting provisions in successful fisheries management. It found the Coast Guard's inspection of records and catch the key to the reliability of those records. *Id.,* p 1085. The court also noted that unreasonable discretion was not vested in the officers. The search was limited to regulation enforcement; searches for the purpose of general execution of the criminal laws were not permitted. Because fishing could occur both day and night, it was not unreasonable that searches were authorized at any time the ships were actually engaged in fishing. *Id.,* p 1086.

Similar provisions of the Sockeye Salmon or Pink Salmon Fishing Act of 1947 have also been upheld. *United States v Raub,* 637 F2d 1205 (CA 9, 1980). The act authorized enforcement agents to board vessels without warrants for the purpose of ascertaining compliance with fishing regulations. 16 USC 776d(d). An officer of the National Marine Fisheries Service requested permission to board and inspect a fishing vessel on the basis of statements of other fishers that Raub's boat was unfamiliar to them and the possibility that illegal gill nets had been observed in the water off Raub's boat. The search revealed an inconsistency between Raub's Bureau of Indian Affairs identification card and the name on a placard which appeared to authorize Raub to fish in the area. Raub ultimately admitted the placard was not his. The court applied the *Colonnade-Biswell* exception to

uphold this warrantless search, finding that the salmon fishing industry in the Puget Sound was historically and pervasively regulated, and that salmon conservation was an important federal interest. The court also noted that the act authorized searches only when officers had "reasonable cause" to believe that violation of the statute was occurring. The scope of the search was implicitly restricted to areas of the ship which had to be inspected to enforce the fishing regulations. *Id.,* p 1210. Given these restrictions, and the long history of detailed regulation of the industry, the court could not say that Raub's reasonable expectations of privacy were violated.

Provisions of the Marine Mammal Protection Act were recently challenged and upheld in *Balelo v Baldrige,* 724 F2d 753 (CA 9, 1984). Regulations promulgated under the act required tuna fishing vessel owners to consent to the placement of "observers" on their vessels. The observers collected information regarding the illegal killing of porpoises which typically occurred in the course of hauling in the tuna catch. 16 USC 1381(d); 50 CFR 216.24(f). The court found that the power to impose the stationing of an observer on a vessel, although not *expressly* conferred upon the Secretary of Commerce, was implicit in the broad rule-making authority expressly delegated to the secretary. The observer program was implemented because the vessels operated over thousands of square miles of open ocean for months at a time, and no independent surveillance program could verify whether or not a particular vessel complied with legislative quotas. *Id.,* pp 760-761. Alternative observation techniques, such as aerial surveillance, were prohibitively costly. The observers confined their observations to the fishing operations of the vessel, which occurred on the open sea or on deck.

The act, its regulations, and the National Marine Fisheries Services Manual established "a predictable and guided federal presence" and limited the scope of the data collection. In addition, the vessel owner was given advance notice of the stationing of an observer on his boat. *Id.,* p 766. A concurring judge wrote that he found this kind of search "overwhelmingly intrusive," but admitted being "struck by the precautions the government has taken to limit the intrusiveness of the observer program. The regulatory scheme is detailed; the inspectors can report about porpoises and nothing more; absolutely no alternative method of enforcement exists." *Id.,* pp 767-768.

The only federal court which has overturned a warrantless search under circumstances roughly analogous to those at issue here held the Northern Pacific Halibut Act, 16 USC 772d(a), unconstitutional for its failure to provide sufficient safeguards to the privacy interests of individuals. *United States v Taylor,* 488 F Supp 475 (D Or, 1980). Special agents of the National Oceanic and Atmospheric Administration saw a box being thrown into the back of a truck from a fishing vessel, but they had no reason to suspect that the crew of the vessel had violated any fishing laws. Their subsequent search of the vessel revealed four illegal halibut among some 10,000-12,000 pounds of fish. The act permitted the boarding of any vessel at any time for the purpose of enforcing its provisions. Although the court made reference to *Colonnade* and *Biswell,* it did not discuss whether the search fell within the pervasively regulated industry exception to the warrant requirement because the act applied to commercial and noncommercial vessels alike. Rather, it concluded that upholding the unfettered discretion of officers as exercised in this case would allow break-

ing and entering of any vessel at any time under the guise of searching for illegal halibut.

These cases generally demonstrate that the federal district and circuit courts have concluded that warrantless administrative inspections of commercial fishing vessels fall within the "pervasively regulated industry" exception to the warrant requirement, and hence are not "unreasonable searches."

C. *Practice in Other States*

In order to gain a broader perspective on the resolution of this issue, we look to the conclusions of other state courts which have been faced with constitutional challenges to warrantless searches of commercial fishing vessels. The State of Washington upheld a statute allowing warrantless searches of any person or boat when the fisheries inspector has "reason to believe that food fish or shellfish are kept for sale, barter, or other purpose, and which he has reason to believe contain evidence of violations of the fisheries code. . . ." Wash Rev Code 75.08.170. *Washington v Mach,* 23 Wash App 113, 114; 594 P2d 1361 (1979). The defendants were found to be in unlawful possession of salmon caught with a gill net during a closed season. Relying on the *Colonnade-Biswell* exception, the court held that commercial fishing is a "pervasively regulated" industry, noting that Washington's fish runs were a precious natural resource and that the jurisdiction had a long tradition of regulation of fish runs. *Id.,* p 115. Because the defendants conceded that the state officers had reason to believe they were violating the fisheries code, the court declined to discuss the difference between the standard of "probable cause" traditionally required for issuance of a criminal search warrant and the "reason to believe" standard appearing in the statute. *Id.,* p 116.

The Oregon courts upheld the warrantless search of the business premises of a licensed food fish canner and wholesale fish dealer. *Oregon v Westside Fish Co,* 31 Or App 299; 570 P2d 401 (1977). The Oregon statute authorized fish and game officers to "enter and inspect all canneries, cold storage houses, packing establishments, business places, boats, fishing gear, and all property used in the taking, processing and packing of food fish, for the purpose of enforcing the commercial fishing laws." Or Rev Stat 506.620. *Id.,* p 301. The officers searched the defendant's premises, without probable cause to believe a violation had occurred, and discovered unlawfully possessed fish. The court found the search to be constitutional by reference to the *Biswell* rationale: the public interest to be protected was great, the commercial fishing industry was pervasively regulated, advance notice of inspections would render them ineffective, and the licensee's reasonable expectations of privacy were not great. *Id.,* p 302.

California's Fish and Game Code provides that "[t]he department may enter and examine . . . any fishing boat . . . and ascertain the amount of fish received, or kind and amount of fishery products packed or manufactured . . . and may examine any books and records containing any account of fish caught, bought, canned, packed, stored or sold." Fish and Game Code, § 7702. A warrantless search of a vessel docked in Los Angeles harbor revealed illegally possessed Pacific mackerel, and was upheld in reliance on the pervasively regulated industry doctrine. *People v DiBernardo,* 79 Cal App 3d Supp 5; 144 Cal Rptr 902 (1978). The same result was reached in a case where two officers entered a wholesale fish dealer's business premises for the purpose of determining whether he was maintaining adequate records, and discov-

ered illegal possession of sport-caught fish. *People v Harbor Hut Restaurant,* 148 Cal App 3d 1151; 196 Cal Rptr 7 (1983). *Harbor Hut* noted the Ninth Circuit Court of Appeals decisions discussed above, and the application of the *Colonnade-Biswell* rule by California courts in the context of other licensed businesses.[10] The court also stressed that § 7702 limited the purposes of searches to "the ascertainment of fish received and an examination of records." *Id.,* p 1156. Inspections authorized under a different section of the code were expressly limited to transactions conducted six months prior to the search. Because of these protections, the searches were sufficiently circumscribed to withstand scrutiny under the Fourth Amendment.

New Hampshire's courts affirmed the constitutionality of a statute which authorized conservation officers to search a boat without a warrant when they had "reasonable cause" to believe that illegal lobsters were concealed there. NH Rev Stat Ann 211:41I. *State v Marconi,* 113 NH 426; 309 A2d 505 (1973). Although the fact that the defendants had dumped lobster baskets in plain view of the officers gave the officers "probable cause" to believe there were more short lobsters on the boat, the defendants' attempts to evade and resist the officers' proposed inspection prior to the dumping furnished "reasonable cause" as well. *Id.,* p 429. The court cited *Colonnade* and *Biswell* without

[10] Other California Courts of Appeal have upheld warrantless inspections of records of a provider of health care services *(Miller v Obledo,* 79 Cal App 3d 714; 145 Cal Rptr 140 [1978]); coin operated machines located in the recreational building of an apartment complex *(Cowing v City of Torrance,* 60 Cal App 3d 757; 131 Cal Rptr 830 [1976]); records of an automotive dealership *(People v Conway,* 42 Cal App 3d 875; 117 Cal Rptr 251 [1974]); auto repair shop *(People v Grey,* 23 Cal App 3d 456; 100 Cal Rptr 245 [1972]); and records and premises of a liquor licensee *(People v Lisner,* 249 Cal App 2d 637; 57 Cal Rptr 674 [1967]).

elaborating on their application in these circumstances.

Lastly, another of the Great Lakes states, Wisconsin, upheld a statute authorizing conservation officers to enter "any building or structure, excluding a dwelling place, in which nets or fish are stored, processed, packed or held, or to enter any vessel or vehicle being used to transport nets or fish when the owner or agent in charge is present or upon 8 hours' notice." The statute also authorized the inspection of "buildings, structures, vessels or vehicles, all pertinent equipment including nets . . . and any fish stored, processed, packed or held in the places to be inspected." Wis Stat 29.33(6). *State v Erickson,* 101 Wis 2d 224, 226-227, fn 3; 303 NW2d 850 (1981). The wardens searched a vehicle used to transport fish in the presence of the owner and discovered untagged lake trout. The court described warrantless searches falling within the "pervasively regulated industry" doctrine as presumptively reasonable, and found that the wardens had not exceeded their authority. The court stated that "[a] requirement that state wardens procure a warrant for inspections designed to locate easily transferable and transportable, untagged fish would substantially impair the state's enforcement capabilities." *Id.,* p 229.

This survey indicates that most state courts faced with the task of balancing the people's interest in protection of fishery resources against commercial fishers' interest in privacy conclude that warrantless administrative inspections are not unreasonable searches.

IV. ADOPTION OF THE PERVASIVELY REGULATED
INDUSTRY DOCTRINE

The preceding federal and state cases provide

guidance and persuasive authority for our adoption of the "pervasively regulated industry" doctrine as the law of this state. We conclude that conflicts arising under art 1, § 11 of the Michigan Constitution between the enforcement needs of governmental agencies and the privacy interests of regulated commercial actors should be resolved by balancing the following factors:[11]

(1) the existence of express statutory authorization for search or seizure;[12]

(2) the importance of the governmental interest at stake;[13]

(3) the pervasiveness and longevity of industry regulation;[14]

---

[11] See generally Note, *Administrative search warrants*, fn 3 *supra*, p 619, fn 41; Greenberg, *The balance of interests theory and the Fourth Amendment: A selective analysis of Supreme Court action since* Camara *and* See, 61 Cal L R 1011 (1973).

[12] See *Colonnade, supra,* pp 73-74, 76-77; *Biswell, supra,* pp 311, 317; *Donovan, supra,* pp 596-597, 604; *Tsuda Maru, supra,* p 1227; *Kaiyo Maru, supra,* p 1083; *Raub, supra,* p 1210; *Westside Fish Co, supra,* p 301; *Harbor Hut Restaurant, supra,* p 1156; *Erickson, supra,* p 228. Factor (1) in this balancing analysis calls for consideration of whether express statutory authorization for search and seizure exists. The United States Supreme Court in *Colonnade, Biswell,* and *Donovan,* and the appellate courts of Oregon, California, and Wisconsin in *Westside Fish Co, Harbor Hut Restaurant,* and *Erickson,* authorized warrantless searches even though the statute did not expressly so provide. In the other three cases cited above, *Tsuda Maru, Kaiyo Maru,* and *Raub,* lower federal courts authorized warrantless searches under the federal Fishery Conservation and Management Act and the Sockeye Salmon or Pink Salmon Fishing Act, which do expressly provide for warrantless searches. While the Michigan Legislature did not expressly provide for warrantless searches in its Commercial Fishing Law, it is probable that it acted with the same intent as did the United States Congress when it provided for regulatory inspections in federal legislation.

[13] See *Colonnade, supra,* pp 75-76; *Biswell, supra,* pp 315-316; *Donovan, supra,* p 602; *Tsuda Maru, supra,* p 1229; *Kaiyo Maru, supra,* p 1085; *Raub, supra,* pp 1209-1210; *Westside Fish Co, supra,* p 302; *Erickson, supra,* p 229; *Harbor Hut Restaurant, supra,* p 1154.

[14] See *Colonnade, supra,* p 75; *Biswell, supra,* p 315; *Donovan, supra,* p 606; *Kaiyo Maru, supra,* p 1085; *Tsuda Maru, supra,* p 1229; *Raub, supra,* p 1209; *Balelo, supra,* p 765; *Mach, supra,* p 115; *Westside Fish Co, supra,* p 302; *Harbor Hut Restaurant, supra,* pp 1155-1156; *Erickson, supra,* p 229.

(4) the inclusion of reasonable limitations on searches in statutes and regulations;[15]

(5) the government's need for flexibility in the time, scope, and frequency of inspections in order to achieve reasonable levels of compliance;[16]

(6) the degree of intrusion occasioned by a particular regulatory search;[17] and

(7) the degree to which a business person may be said to have impliedly consented to warrantless searches as a condition of doing business, so that the search does not infringe upon reasonable expectations of privacy.[18]

These seven factors differ only slightly from the five factors applied in the federal courts. See *ante,* p 608. Michigan factor (2) does not appear in the federal list, and Michigan factors (5) and (6) further explicate federal factor (4).

This "balancing of interests" is a rational approach to the problem, because there is a meaningful distinction between regulatory or administrative searches and those conducted for the purpose of discovering the fruits or instrumentalities of crime. The administrative inspector must be equipped with investigatory techniques which differ from those available to peace officers because

[15] See *Tsuda Maru, supra,* p 1229; *Kaiyo Maru, supra,* p 1086; *Raub, supra,* p 1210; *Balelo, supra,* p 766; *Taylor, supra,* pp 478-479; *Harbor Hut Restaurant, supra,* p 1156; *Erickson, supra,* p 229.

[16] See *Biswell, supra,* pp 315-316; *Donovan, supra,* p 603; *Kaiyo Maru, supra,* p 1086; *Balelo, supra,* p 766; *Westside Fish Co, supra,* p 302; *DiBernardo, supra,* p Supp 7; *Harbor Hut Restaurant, supra,* p 1156; *Erickson, supra,* p 229.

[17] See *Tsuda Maru, supra,* p 1229; *Balelo, supra,* p 766; *Erickson, supra,* p 229.

[18] See *Biswell, supra,* p 316; *Barlow's, supra,* p 313; *Kaiyo Maru, supra,* p 1086; *Raub, supra,* p 1210; *Balelo, supra,* p 765; *Mach, supra,* p 115; *Westside Fish Co, supra,* p 302; *Harbor Hut Restaurant, supra,* pp 1154-1155; *Erickson, supra,* p 229.

regulatory misconduct differs from criminal mis-
conduct. Most administrative code violations occur
in areas not readily subject to public oversight,
and hence go unreported and must be sought out.
Criminal acts, on the other hand, are often com-
mitted in public places or directly involve a victim
with a high incentive to report a loss or injury.
Code enforcement generally involves repeated de-
tections of numerous minor violations; enforce-
ment of criminal statutes often requires extensive
investigation of a single flagrantly illegal act.[19]

## V. New Standard Applied to Michigan's Commercial Fishing Industry

A. *Factors (1), (2), and (3): Statutory Authorization, Importance of Government Interest and Longevity of Regulation*

Since the late nineteenth century, Michigan has
placed limitations on the ability of private. fishers
to deplete or damage the state's fishing resources.
As early as 1885, the Legislature made fishing in
specified waters, if accomplished by the use of a
variety of fishing devices, punishable by fine or
imprisonment. 1885 LA 329, cited in *People v*

---

[19] LaFave, *supra,* p 16. Professor LaFave argues that administrative
searches intrude less on personal privacy and dignity than do crimi-
nal searches. First, the time required to search a specific commercial
area for a specific defect is likely to be less than that required to
make a general search through personal belongings to discover evi-
dence of crime. Second, inclusion in a routine or an area-wide inspec-
tion program conducted to prevent or correct code violations entails
far less damage to reputation than being singled out for suspicion of
criminal conduct. Third, persons routinely required to follow detailed
regulations are generally familiar with those regulations, and there-
fore can readily predict the scope of an inspection to enforce the
regulations. Because of this "notice," reasonable or justifiable expecta-
tions of privacy must necessarily be lower for the person engaged in a
pervasively regulated business than for the ordinary private citizen
suspected of criminal conduct. *Id.,* pp 18-19. See also *Michigan v
Tyler, supra,* pp 576-577, citing with approval Professor LaFave's
distinctions.

*Collison,* 85 Mich 105, 106; 48 NW 292 (1891). It is especially noteworthy that the same legislation seemed implicitly to authorize law enforcement officers to search for illegal fishing equipment on the waters:

"In all prosecutions under this act it shall be *prima facie* sufficient, on the part of the people, to show that the defendant was found upon the waters of said lake with spear, net, trap-net, 'jack,' or artificial light of any kind, or with dynamite, giant-powder, or any other explosive substance or combination of substances." *Id.*[20]

In its discussion of the defendant's illegal fishing activities, the Court in *Collison* stated:

"To fish is a privilege accorded by the State, and the question of individual enjoyment is one of public privilege, and not of private right.

\* \* \*

"Hence, for the protection of fish, a valuable article of food and merchandise, the control of which is in the State, and to preserve equality in the right to fish, the State has an undoubted right to regulate the manner in which they shall be caught, and to protect their migrations." *Id.,* pp 108-109.

The principles expressed above are echoed throughout cases decided and statutes enacted since the late nineteenth century. In 1921, the Legislature consolidated the power previously spread among a variety of agencies in one Department of Conservation. 1921 PA 17. In order to carry out its mandate to protect the state's natural

[20] Neither the local act nor any subsequent court opinion interpreting it indicates whether state officers were required to obtain a warrant or show they had probable cause to search the vessel. However, the provision is significant because it refutes the fishers' claim before this Court that inspections of fishing vessels on the waters do not enjoy a long history in Michigan.

resources, the Department of Conservation was empowered to adopt rules and regulations. The Legislature acted again in 1925, specifically allocating to the department the power to regulate the taking of fish whenever they were in danger of depletion or extermination or required additional protection. 1925 PA 230. That delegation of authority was approved unanimously by this Court. *People v Soule,* 238 Mich 130; 213 NW 195 (1927). The term before, this Court denied a claim by a riparian owner that he held exclusive fishing privileges on a section of the well-known trout stream bordering his property, stating:

"So long as water flows and fish swim in Pine river, the people may fish at their pleasure in any part of the stream subject only to the restraints and regulations imposed by the State. In this right they are protected by a *high, solemn* and *perpetual* trust, which it is the duty of the State to forever maintain." *Collins v Gerhardt,* 237 Mich 38, 49; 211 NW 115 (1926).

See also *Aikens v Dep't of Conservation,* 28 Mich App 181; 184 NW2d 222 (1970).

In 1929, the Legislature enacted a comprehensive scheme for enforcing laws relating to the preservation of fish, wild birds, and wild animals, repealing and replacing a series of laws regulating fishing dating back to 1861. 1929 PA 84, 165, 192. As discussed in *Seaman, supra,* Act 192 provided for the warrantless search of any "boat, conveyance, vehicle, automobile, fish box, fish basket, game bag, game coat, or any other receptacle [or place, except dwelling]" where fishing apparatus or fish could be kept, on probable cause to believe that any conservation law had been violated. MCL 300.12; MSA 13.1222. Among the stated purposes of Act 84 were to provide for financial remuneration to the state for fish taken for commercial

purposes, to provide for the issuing of licenses and permits, to provide for the confiscation of property used or possessed in violation of the act, and to define penalties for violations of the act. 1929 PA 84. The Legislature explicitly declared, "All fish of whatever kind found in the waters of lakes Superior, Michigan, Huron and Erie, commonly known as the Great Lakes, . . . shall be, and are hereby declared to be, the property of the state. . . ." MCL 308.1; MSA 13.1491. When the act was amended in 1968, the Legislature expanded the sentence above to make clear that "the taking [of such fish] is declared to be a privilege." *Id.*

In 1948, the Legislature passed the following provision:

"Every person exercising said privilege [to hunt, fish, trap, capture or kill wildlife] does so subject to the right of the state to inspect and examine, private dwelling houses, cold storage lockers and cold storage plants excluded, without warrant, any hunting, fishing or trapping apparatus or appliance, . . . ordinarily used in hunting, fishing or trapping, or any boat, conveyance, vehicle, automobile, hunting or fishing camp, fish box, fish house, . . . or any other receptacle, car or conveyance, in which such wild life may be kept, carried or transported." 1948 (1st Ex Sess) PA 43, MCL 300.23; MSA 13.1231(3) (repealed by 1964 PA 256).

The act also required persons hunting, fishing, or trapping to allow conservation officers to "inspect, count, and examine" all wildlife or hunting or fishing equipment in their possession. *Id.* This latter provision was held to violate the search and seizure provision of Michigan's Constitution in *People ex rel Attorney General v Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120 (1950). That case might prove apposite to the cases presently before this Court, but for the crucial fact

that the party accused of violating the state's conservation laws in that case took the state's wildlife for pleasure rather than for profit. Because we deal here with parties engaged in a pervasively regulated *commercial* endeavor, *Lansing Municipal Judge* is inapposite. We do not pass here on the question whether the DNR may make warrantless searches, absent probable cause and exigent circumstances, of the persons or property of *recreational* fishers for the purpose of enforcing regulations which limit their activities.

When the people of Michigan adopted a new state constitution in 1963, they included a provision for the protection of this state's abundant natural resources:

"The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction." Const 1963, art 4, § 52.

Operating within this constitutional prescription, the 1968 and 1970 Legislatures revised the Commercial Fishing Law of 1929. As it presently stands (and as it stood at the time the DNR attempted to search plaintiffs' boats), the statute regulates in excruciating detail the numbers, sizes, and species of fish which may be removed from Michigan's waters, the seasons in which they may be removed, the places from which they may be removed, and the kinds of nets, hooks, and other equipment which may be used to remove them. MCL 308.2 *et seq.;* MSA 13.1492 *et seq.* The act also regulates the shipping and marketing of fish, and places extensive reporting obligations on com-

mercial fishers. MCL 308.20 *et seq.;* MSA 13.1511 *et seq.*

The statute requires all commercial fishers to be licensed by the state. MCL 308.22; MSA 13.1513. Licensing fees are used to defray enforcement expenses and to protect and propagate fish. MCL 308.26; MSA 13.1517. In addition, the state collects a percentage of the commercial licensee's sale price as remuneration for fish taken. MCL 308.1c; MSA 13.1491(3). The Commercial Fishing Law specifically provides that "the license issued by the director of conservation may contain provisions: . . . (e) [s]pecifying other conditions, terms and restrictions which are deemed to be necessary in carrying out the provisions of this act, including but not limited to the right to inspect the licensee's fishing operations in the waters, on board or ashore."[21] MCL 308.1b(2); MSA 13.1491(2)(2). The licenses held by each of the plaintiffs here contained the following clause:

> "The director of the Department of Natural Resources or his representative may at any time inspect the vessels, vehicles, books, records, documents or other property used in carrying on the licensee's fishing operations and business; and further, may inspect and examine any fish in transport or in storage at any warehouse or in any truck, train or other conveyance whether common carrier or not."

The act also empowers the Director of the DNR to suspend or revoke any fishing license when a licensee violates or fails to fulfill any conditions or terms of the license. MCL 308.1b(4); MSA 13.1491(2)(4). Background for these detailed and undoubtedly burdensome regulations is found in the short history provided by a lower court in an unrelated case:

---

[21] See fn 11.

" 'Commercial fishing on the Great Lakes has been recorded since 1820. In former days it was a flourishing industry. There can be no doubt but what Indians engaged in this commercial venture. Late in the 1800's the State began to regulate this industry since it then appeared that it was not an inexhaustible resource as previously believed. In 1908 sport fishing regulations first appeared. By 1960 both commercial and sport fishing had fallen off to the extent that the authorities became alarmed at the loss of this natural resource. In 1964 it became apparent that the Great Lakes would have to be replenished to restore Lake Trout as a natural resource.

\* \* \*

" '[W]hen a modern commercial fisherman was equipped with modern gear, including electronic locating devices, powered fishing tugs and lifting winches that could haul in miles of nets, . . . there was no limit to the catch. When such a fisherman invaded the vulnerable zones and depths where fish were in large numbers at certain seasons the chance for survival was small.

" 'In the opinion of the Court the need for regulation of both commercial and sport fishing in the Great Lakes at this critical time was vividly demonstrated.

\* \* \*

" '[T]he proofs in this case before this Court are overwhelmingly convincing that unregulated fishing could and would deplete the fish resources of the Great Lakes to the extent that they would become nonexistent.' " *Michigan United Conservation Clubs v Anthony,* 90 Mich App 99, 106-107; 280 NW2d 883 (1979).

The chronological survey provided here demonstrates beyond a doubt that Michigan attaches great importance to the preservation and development of its fishery resources. The state's commitment to this task is historically rooted and constitutionally mandated. Michigan's commercial fishing statute regulates nearly every aspect of the

fisher's activity, at the dockside, on the water, and in the marketplace, and contemplates administrative inspections as an important enforcement technique.

One could also view Michigan's pervasive regulation of the commercial fishing industry as analogous to its pervasive and long-lived regulation of other food industries, such as the dairy industry, MCL 288.21 *et seq.;* MSA 12.617(101) *et seq.,* the apple industry, MCL 290.51 *et seq.;* MSA 12.1220(1) *et seq.,* and the livestock industry, MCL 287.2 *et seq.;* MSA 12.371 *et seq.* The pervasive regulation of foodstuffs reflects the state's intense interest in the health and welfare of its citizens. These are industries of great public interest, and consequently it is not unreasonable that they be conducted subject to public scrutiny. The commercial fishing industry is a particularly appropriate one for state regulation because the people of Michigan have an actual proprietary interest in the fish.

B. *Factor (4): Reasonable Limitations*

The statute which authorizes the DNR to search fishers' vessels contains limitations on the time, place, manner, and scope of the inspection. The statute states that the "conditions, terms, and restrictions" imposed on commercial fishing licensees, including the right to inspect their fishing operations, must be deemed "necessary" to carry out the provisions of the act. MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e). This clause restricts the DNR's power to search in two ways: 1) the DNR is only justified in making warrantless inspections which are "necessary" to enforcement of the act, and 2) the "conditions, terms, and restrictions" of the license with respect to time, place, and frequency of inspection must be "necessary" to enforcement.

However, the DNR has not yet promulgated any rules or regulations which guide its officers in choosing an appropriate time, place, manner, or scope of inspection. In fact, the license issued to commercial fishers imposes a requirement that they submit to searches "at any time." The blanket authorization given to DNR officers to search fishing vessels "at any time," as set forth in plaintiffs' licenses, may or may not be "necessary" to the effective enforcement of the Commercial Fishing Law. To attempt a search at a time when a fisher is trying to beat a storm to port, for example, would probably be an unnecessary exercise of the DNR's powers. The record of these cases does not illuminate what searches are and what searches are not "necessary," nor does the record indicate whether the attempted searches at issue in these cases were "necessary."

Another restriction found within the language of the fishing statute goes to the legitimate scope of a DNR search. The statute states that the DNR shall have the right to inspect a licensee's "fishing operations." MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e). This language restricts the scope of a state search to areas of the fishers' commercial premises which comprise their "fishing operations."[22] This excludes private and non-business operations and areas. Because the DNR was not permitted to search plaintiffs' vessels, the facts before us do not warrant further definition of the areas included within that term. That issue must await a case in which a party challenges a search as having extended beyond its lawful scope.

## C. *Factor (5): The DNR's Enforcement Needs*

The record presently before us does not permit

---

[22] See *Tsuda Maru, supra,* p 1229; *Raub, supra,* p 1210; *Kaiyo Maru, supra,* p 1086.

full consideration of the enforcement needs of the
DNR. The proposal for decision by the hearing
examiner states in its conclusions of law that

"the attempted warrantless inspections involved in
these cases do not fall within the *Colonnade-Biswell*
exception because such warrantless inspections are not
a crucial part of a regulatory scheme. . . . [T]he DNR's
need to conduct routine surprise inspections on the
water can be satisfied by means of ex parte warrants
authorizing the inspection of the vessel of each commer-
cial fisherman licensed to fish in a particular area or
zone."

These legal conclusions are unsupported by find-
ings of fact appearing in the same document, and
are contradicted in the final decision and order of
the Director of the Department of Natural Re-
sources. The director expressly rejected the hear-
ing examiner's conclusions of law and stated that
"[t]he Conclusions of Law and Findings of Fact not
considered or accepted in this Final Decision are
rejected as being without merit." The director did
not provide any factual basis for his rejection of
the hearing examiner's factual findings, if any, or
legal conclusions, but concluded as a matter of law
that "warrantless inspections of licensed commer-
cial fishing vessels are authorized by the Commer-
cial Fishing Law and do not subject respondents to
an unreasonable search and seizure." The absence of
an adequate factual record on this issue precludes
a final decision by this Court.

D. *Factor (6): Intrusiveness of the Search*
   This factor can only be weighed after a search
has been effected. Because the DNR was not per-
mitted to search plaintiffs' vessels, we cannot eval-
uate the intrusiveness of the search as part of our
balancing analysis. We note in passing, however,

that the parties disagree as to the customary intrusiveness of a regulatory inspection.[23]

E. *Factor (7): Implicit Consent*

Neither commercial fishers nor other business people can be required to surrender their constitutionally protected rights in exchange for the privilege of doing business. *People v Lansing Municipal Judge, supra,* pp 431-432. However, anyone engaged in the commercial fishing business must be prepared to submit to reasonable regulations and, consequently, to diminished expectations of privacy. As stated by a California court which upheld the warrantless search of a wholesale fish dealer's facilities:

---

[23] In their brief and at oral arguments, the fishers contended that inspections on the water posed potentially disastrous consequences because of the perishability of whitefish. They painted a picture of hundreds of fish being exposed to the hot sun on the decks of their vessels while DNR officers sorted and measured the catch. However, at the administrative hearing, DNR Officer Wormwood testified as follows:

"*Q.* Where would you have looked to find these fish?

"*A.* In the fish boxes and, if he had a hold on his boat that was built for the purpose of storing fish, a cooler.

"*Q.* And to conduct a proper inspection, you would have had to remove a considerable number of fish from the boxes?

"*A.* Not necessarily.

"*Q.* Well, did you want to inspect only the top layer of fish or did you want to sort through, at least at random, any fish boxes that you might find?

"*A.* Usually we can slip a hand down alongside of the fish, between the fish and the edge of the box and force them back a little to see if there are any—any trout underneath. If we could see a considerable number of undersize whitefish, I think we would then, perhaps, go on a more thorough inspection to measure many of the fish, but I think just a visual inspection, we could probably have a pretty good idea if they are in fact in compliance.

"*Q.* And if the fish box is in the hold of the ship or underneath the deck, you'd have to bring them—bring them up on top, would you not?

\* \* \*

"*A.* If—if there was a large number of them so they were stacked one on top of the other, it would be necessary. If there were just a few, perhaps they could be inspected."

"The central precept to be found in *Colonnade, Biswell,* and *Donovan* is that, in undertaking to engage in a highly regulated and licensed enterprise, the entrepeneur thereby consents to the array of regulations associated with the trade; that is, its burden as well as its benefits. The businessman engaged in such a trade cannot but reasonably anticipate that his establishment is subject to periodic inspections undertaken to further the regulatory objective." *People v Harbor Hut Restaurant, supra,* pp 1154-1155.

The licenses issued to plaintiffs gave them direct notice that warrantless searches of their business premises could be performed at any time, at nearly any place, as a condition of their receiving the license. This fact militates strongly in favor of holding that their justifiable expectations of privacy were not violated by the searches attempted here.

### F. *Summary*

It appears from this balancing analysis that most of the relevant factors support the DNR's claim that its interest in conducting warrantless searches of commercial fishing vessels without probable cause or exigent circumstances outweighs the fishers' privacy interests. Such searches are statutorily authorized and stem from a governmental interest of paramount importance. Regulation of the commercial fishing industry is long-lived and pervasive. The right to inspect, and the time, place, and frequency of inspections are subject to the limitation that they be "necessary" to achieving acceptable levels of enforcement. The inspections are limited in scope to a licensee's "fishing operations."

Thus, the Michigan commercial fishing industry under the Commercial Fishing Law of 1929 falls within the parameters of the pervasively regulated

industry exception to the warrant requirement. Because warrantless searches in these circumstances are not "unreasonable," fishers who accept a commercial fishing license are not required to do so on the condition that they waive their constitutional right to be free from unreasonable searches. Although in the case of the Tallman vessel the DNR had probable cause, even under criminal standards, to conduct a warrantless search, no search was conducted. Under the pervasively regulated industry standard adopted here by this Court, valid warrantless searches may have also resulted in *Seaman* and *Casey* had the DNR persisted in their inspection in the manner which they described in their brief.[24]

## VI. License Revocation and Suspension

The DNR argues that, by refusing to allow inspection of the commercial fishing vessels, the fishers violated the terms of their commercial fishing licenses and that, as a consequence of that violation, the DNR properly ordered the suspension of their licenses for a period of sixty days. The DNR attempts to bolster their argument by concluding, as we have above, that commercial fishing is a pervasively regulated industry and, therefore, that a warrantless search was constitutionally valid.

Any authority which the DNR has to suspend or revoke a license must be pursuant to their statutory authority. The statute provides that "[t]he director of conservation may suspend or revoke any license issued under this act when the licensee fails to fulfill or violates any of the conditions, terms or restrictions of the license." MCL 308.1b(4); MSA 13.1491(2)(4).

---

[24] See fn 23.

The license held by each plaintiff contained the following clause:

"The director of the Department of Natural Resources or his representative may *at any time* inspect the vessels, vehicles, books, records, documents or other property used in carrying on the licensee's fishing operations and business; and further, may inspect and examine any fish in transport or in storage at any warehouse or in any truck, train, or other conveyance whether common carrier or not."[25] (Emphasis added.)

MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e) authorizes commercial fishing licenses to contain provisions

"[s]pecifying other conditions, terms and restrictions which are *deemed to be necessary* in carrying out the provisions of this act, including but not limited to the right to inspect the licensee's fishing operations in the waters, on board or ashore." (Emphasis added.)

On the record, the Director of the DNR suspended the licenses of the Tallmans, Casey, and Seaman without any findings of fact as to the statutory requirement that conditions, terms, and restrictions be deemed "necessary."[26] As a consequence, a significant statutory requirement was not complied with. To satisfy due process, these cases must, therefore, be remanded to determine whether the inspection "at any time" condition of the fishers' licenses is one which is necessary to carry out the provisions of the Commercial Fishing

---

[25] See the DNR's Brief, p 4.

[26] Although the hearing examiner found probable cause for the attempted search of the Tallmans and no probable cause for Casey and Seaman, the director rejected these conclusions and ordered all three licenses suspended without substituting any findings of fact. However, since no actual search was conducted, reliance on either probable cause in the case of *Tallman* or the pervasively regulated industry exception to the search warrant requirement for *Casey* and *Seaman* would have been misplaced.

Law. If the DNR could effectively enforce the act and protect the interests sought to be safeguarded by the act without the "at any time" clause as a condition of the license, then the statute requires a less intrusive course to be taken. The "at any time" clause in that instance would not be "necessary" to effective enforcement of the act. There remains the possibility that there may be *some* time at which inspections are "necessary." Thus, if the "at any time" clause is not "necessary," the DNR should also determine whether the suspensions of the licenses in these cases were legally valid as during a time in which inspections were "necessary."

## VII. Conclusion

The Court of Appeals erred in reviewing the searches attempted here under MCL 300.12; MSA 13.1222, authorizing warrantless searches of both recreational and commercial fishers, rather than under MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e), applicable to commercial fishers alone.

We adopt the pervasively regulated industry exception to the warrant requirement and apply a "balancing of interests" analysis to determine whether the commercial fishing industry under the Commercial Fishing Law of 1929 falls within the exception. In finding that it does, we conclude that by accepting fishing licenses which permit the DNR to inspect commercial fishing vessels without warrant, commercial fishers have not been required to waive their constitutional freedom from unreasonable searches, and therefore there is no constitutional bar to administrative license suspension under the Commercial Fishing Law of 1929.

Suspension or revocation of commercial fishers' licenses by the DNR must comply with statutory

safeguards. A further finding of fact by the DNR is required to determine if the inspection "at any time" condition of defendants' licenses is "necessary" to carry out the purposes of the Commercial Fishing Law.

Consequently, we remand all three of these cases to the Department of Natural Resources for further proceedings not inconsistent with this opinion.

RYAN, BRICKLEY, and BOYLE, JJ., concurred with WILLIAMS, C.J.

LEVIN, J. *(separate opinion).* The question is whether the Department of Natural Resources may suspend a commercial fishing license because the licensee refused to allow an inspection of his fishing vessel in open waters.[1] We would hold that the attempted inspection may not be justified on the basis of language in a commercial fishing license purporting to authorize the inspection of vessels because the scope of the inspection facially permitted by the license (i) exceeds statutory authorization and (ii) violates the constitutional prohibition of unreasonable searches and seizures.

I

The nature of the commercial fishing industry

[1] Roger and Kirk Tallman, Gerald Casey, and Wayne Seaman each refused to allow DNR officers to board their commercial fishing vessels while in open waters. In *Tallman,* the officers had received information that trap-nets were being used out of season and observed a trap-net on the deck of the Tallmans' vessel. The hearing examiner found that there was probable cause to believe that the Tallmans were using illegal trap-nets and recommended a suspension of the license. In *Casey* and *Seaman,* the hearing examiner found that there was no probable cause to justify the attempted searches. Nevertheless, the Director of the DNR ordered that all three licenses be suspended. The circuit court reversed the suspensions of the Casey and Seaman licenses and affirmed the suspension of the Tallmans' license. The Court of Appeals affirmed. *Tallman v Dep't of Natural Resources,* 123 Mich App 132; 333 NW2d 193 (1983).

justifies regulation and official inspections for the protection of the public. The fish belong to the people[2] who, consequently, have a right to regulate and inspect the commercial operations of those accorded the privilege of taking the fish. Commercial fishing is, moreover, a food industry that must be open to public scrutiny.

The Legislature has provided that commercial fishing licenses may contain provisions "[s]pecifying other conditions, terms and restrictions which are deemed to be necessary in carrying out the provisions of this act, including but not limited to the right to inspect the *licensee's fishing operations* in the waters, on board or ashore." MCL 308.1b(2)(e); MSA 13.1491(2)(2)(e) (emphasis supplied). The statute thus permits inspection of premises and property that comprise the "fishing operations" of a licensee. Such premises and property presumably include those areas of a vessel where fish are caught and stored. By confining inspections to the "fishing operations" areas of commercial vessels, the privacy of vessel owners and their employees may be protected without sacrificing the legitimate need to regulate the commercial fishing industry.

The commercial fishing licenses issued to the plaintiffs, however, provide that officials of the DNR "may at any time inspect the *vessels,* vehicles, books, records, documents *or other property used in carrying on the licensee's fishing operations* and business . . ." (emphasis supplied). The language of the license thus exceeds the authorization of the statute by permitting the inspection of "*vessels . . . or other property* used in . . . fishing operations." (Emphasis supplied.)

---

[2] MCL 308.1; MSA 13.1491.

The opinion of the Court recognizes that the statute restricts the scope of a search to "fishing operations" and that private and non-business operations and areas of the vessel are excluded from that term, and states that the exact definition of the term should not be decided in a case where there is no challenge to an actual search.

We would go further and hold that because the license on its face authorizes inspections of private, non-business operations and areas of the vessel, it exceeds the statutory authorization. An attempted inspection under the purported grant of authority to inspect fishing *vessels* set forth in the license exceeds the authorization of the statute. Resolution of the instant cases does not depend on an actual inspection.

## II

Commercial fishing licensees have a constitutional right to be free from unreasonable searches and seizures.[3] A warrantless search conducted without probable cause to believe that a violation of law has occurred may not intrude into those areas of a vessel that cannot properly be deemed part of "fishing operations." The captain's private cabin and the crew's quarters, for example, are not subject to warrantless searches without i) probable cause to believe that a violation of law has occurred and ii) exigent circumstances justifying the failure to obtain a warrant. That evidence of illegal activity might be found in such "private" areas does not justify a warrantless search any more than the possibility that illegal contraband might be found in a private residence would justify a warrantless intrusion into the residence.

---

[3] US Const, Am IV, applicable to the states under the Fourteenth Amendment, *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961); Const 1963, art 1, § 11.

The issuance or retention of a license may not be conditioned on the surrender of a fundamental constitutional right.[4] The inspection provision set forth in the commercial fishing license facially permits warrantless searches that exceed constitutional limitations as well as the authority conferred by the statute. A property owner's refusal to permit a warrantless search when there is no probable cause to believe that a violation has occurred constitutes the exercise of a fundamental right. Such action may not be penalized by the state through the suspension of a license issued by the state.

Decisions of the United States Supreme Court indicate that significant factors that may legitimate warrantless regulatory searches include narrowly tailored authorization of the time, place, and scope of inspections, restricted discretion of the administrative officers, and the property owner's imputed awareness of the inspection regulations and their scope.[5] The language of the commercial

[4] "[T]he right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *United States v Chicago, M, St P & P R Co,* 282 US 311, 328-329; 51 S Ct 159; 75 L Ed 359 (1931).

See *People v Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120 (1950) (exercise of privilege to hunt or fish may not be conditioned on waiver of right against unreasonable searches and seizures); *Spevack v Klein,* 385 US 511; 87 S Ct 625; 17 L Ed 2d 574 (1967) (disbarment held an impermissible penalty for lawyer's invocation of right against self-incrimination); 1 LaFave & Israel, Criminal Procedure, § 3.9, p 322.

[5] In *United States v Biswell,* 406 US 311; 92 S Ct 1593; 32 L Ed 2d 87 (1972), the United States Supreme Court sustained a statutory inspection scheme that authorized the search during business hours of commercial premises (including storage areas) of licensed firearms dealers for the purpose of examining records and weapons. The Court noted that the regulatory inspection system was "carefully limited in time, place, and scope." *Id.,* p 315.

In *Marshall v Barlow's, Inc,* 436 US 307; 98 S Ct 1816; 56 L Ed 2d 305 (1978), the Court invalidated a provision of OSHA insofar as it authorized warrantless inspections of business premises. The Court

fishing license, permitting officials of the DNR to
"at any time inspect the vessels . . . or other
property" used in the licensee's fishing operations,
does not restrict the time, place, and scope of the
search or the discretion of the administrative offi-
cers; nor does it provide commercial fishing licens-
ees with fair notice of the potential scope of the
inspection regulations.

### III

The Court today adopts a "pervasively regulated
industry" exception to the warrant requirement
and holds that a warrantless inspection is not
unreasonable if the DNR determines that the
inspection is "necessary" to the enforcement of the
commercial fishing statute.

That an activity or industry is, or has been,
pervasively regulated does not justify, perforce,
further governmental intrusion into the affairs of
those subject to such regulation.[6] It is, rather, the
nature of a particular activity or industry that
justifies governmental regulation for the protec-
tion of the public and may justify limited warrant-

rejected the argument that a warrant requirement would add only
marginal protections, saying that "[t]he authority to make warrant-
less searches devolves almost unbridled discretion upon executive and
administrative officers" and that a warrant would "advise the owner
of the scope and objects of the search." *Id.,* p 323.

In *Donovan v Dewey,* 452 US 594; 101 S Ct 2534; 69 L Ed 2d 262
(1981), the Court sustained a warrantless inspection provision of the
Mine Safety and Health Act. The Court said that the statute notified
the mine operator that inspections would be performed on a regular
basis, informed the operator of what health and safety standards
must be met, and, thus, curtailed the discretion of government
officials.

[6] See *Donovan v Dewey,* 452 US 594, 612; 101 S Ct 2534; 69 L Ed 2d
262 (1981) (Stewart, J., *dissenting):* "Under the peculiar logic of
today's opinion, the scope of the Fourth Amendment diminishes as
the power of governmental regulation increases. Yet I would have
supposed that the mandates of the Fourth Amendment demand
heightened, not lowered, respect, as the intrusive regulatory authority
of government expands."

less "intrusion" for the purpose of regulatory enforcement.

In *Marshall v Barlow's, Inc,* 436 US 307; 98 S Ct 1816; 56 L Ed 2d 305 (1978), the United States Supreme Court held that a warrant was constitutionally required to conduct administrative inspections under the Occupational Safety and Health Act of 1970, although § 8a of the act[7] authorized the Secretary of Labor to inspect at reasonable times "any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer" subject to the act. OSHA imposes safety and health standards on all persons "engaged in a business affecting [interstate] commerce who ha[ve] employees";[8] it would appear to be a "pervasive" regulatory scheme. Yet, pervasive regulation by itself was insufficient justification for warrantless inspections.[9]

Similarly, it is difficult to identify an activity that has been and is subject to more pervasive regulation than the operation of motor vehicles.[10] If the pervasiveness or longevity of regulation itself justified a relaxation of constitutional protections against unreasonable searches and seizures, it would seem that motor vehicles might, at the

---

[7] 29 USC 657(a).

[8] 29 USC 652(5).

[9] Statutory provisions permitting warrantless administrative inspections to enforce regulations aimed at a *particular activity or industry* have been sustained in the face of Fourth Amendment challenges. *Colonnade Catering Corp v United States,* 397 US 72; 90 S Ct 774; 25 L Ed 2d 60 (1970) (retail liquor dealers); *United States v Biswell,* 406 US 311; 92 S Ct 1593; 32 L Ed 2d 87 (1972) (firearms dealers); *Donovan v Dewey,* 452 US 594; 101 S Ct 2534; 69 L Ed 2d 262 (1981) (underground and surface mines). OSHA, however, "fails to tailor the scope and frequency of . . . administrative inspections to the *particular* health and safety *concerns posed by the numerous and varied businesses regulated* by the statute." *Donovan v Dewey, supra,* p 601 (emphasis supplied).

[10] See MCL 257.1-257.1712; MSA 9.1801-9.3400(12).

discretion of police officers, be stopped and inspected at any time without a warrant or a reasonable and articulable basis for concluding that a violation of law has occurred. Neither this Court[11] nor the United States Supreme Court[12] has so held.

The nature of the commercial fishing industry justifies official inspection of the "fishing operations" of commercial fishing licensees. It does not justify warrantless searches of private, non-business operations and areas of commercial fishing vessels.

## IV

Because there was no probable cause to search the Casey or Seaman vessels, suspension of their commercial fishing licenses was improper.

The hearing examiner and the Director of the DNR found that there was probable cause to search the Tallmans' vessel. The record does not indicate whether the DNR officers requested permission to board the vessel on the basis of the language of the license or on the basis of probable cause. *Tallman* should be remanded for further proceedings.

The judgment of the Court of Appeals should be affirmed in *Seaman* and *Casey* and the cause in *Tallman* remanded to the DNR for further proceedings.

KAVANAGH, J., concurred with LEVIN, J.

CAVANAGH, J., took no part in the decision of this case.

---

[11] See *People v Freeman,* 413 Mich 492; 320 NW2d 878 (1982).

[12] See *Delaware v Prouse,* 440 US 648; 99 S Ct 1391; 59 L Ed 2d 660 (1979).